Norman Trabulus
345 SEVENTH AVENUE
21ST FLOOR
NEW YORK, NEW YORK 10001
(212) 221-7811 telephone
(212) 398-8835 telefacsimile

Member, NY Bar                                              email: ntrabulus@gmail.com

August 22, 2014

Hon. Raymond J. Dearie
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re: Objections to Presentence Investigation Report – *United States v. Philson Andrews,* CR 11–587 (RJD)

Your Honor:

This submission is made in anticipation of defendant Philson Andrews' ("Andrews") sentencing, now calendared for November 20, 2014. Andrews previously submitted objections ("Objections") to the Probation Department's Presentence Investigation Report ("PSR") via a letter to your Honor dated February 4, 201. That letter also addressed 3553(a) factors favorable to Mr. Andrews in relation to his offense conduct.

The Probation Department followed with an Addendum and a Sentence Recommendation. The government has not yet responded to the PSR, the Objections, or the Addendum. September 12, 2014 is the date now set for it to do so.

Included in this submission are letters from Mr. Andrews' mother, Hilda Jackson, and from his girlfriend, Paula Johnson.

I expect a letter from Mr. Andrews to your Honor to be forthcoming. In the meanwhile, suffice it to say that he deeply regrets the choices he made, acknowledges that he knew better than to make those choices, understands that he must accept the consequences, and is focusing on how he may support himself

Hon. Raymond J. Dearie
August 22, 2014
Page 2

legally and productively upon his ultimate release.

**The Addendum continues to be mistaken in stating that <u>Andrews is a career offender.</u>**

The Addendum continues to maintain, erroneously, that Mr. Andrews is a Guideline career offender and that both his 2003 youthful offender adjudication and 2007 felony assault conviction constitute predicate adult convictions for crimes of violence under the career offender Guidelines.

**<u>2003 youthful offender adjudication</u>**

The Addendum cites *United States v. Pereira*, 465 F.3d 515 (2d Cir. 2006) and *United States v. Cuello*, 357 F.3d 162 (2d Cir. 2004). Those cases respectively hold that a youthful offender adjudication may constitute a predicate adult conviction under Guideline 2L1.2 (unlawful re-entry) and Guideline 2K2.1 (firearms) . Neither case directly involves the career offender Guidelines. It is established, however, that a youthful offender adjudication *may* serve as a career offender predicate conviction. *United States v. Jones*, 415 F.3d 256 (2d Cir. 2005).

*Jones, supra*, followed *Cuello, supra*, in applying a "pragmatic" approach. That approach looks to the substance of a youthful offender adjudication rather than the label put on it by New York and its courts.

In *Cuello*, the Second Circuit, quoting its earlier decision in *United States v. Driskell*, 277 F.3d 150, at 157 (2d Cir. 2002), wrote as follows:

> Thus, "[r]ather than finding New York's label conclusive," we held that "the better course is for a district court to examine the substance of the prior conviction at issue; to 'focus on the nature of the proceedings, <u>the sentences received</u>, and the actual time served.' " *Id.* at 157 (quoting *United States v. Pinion,* 4 F.3d 941, 944 (11th Cir.1993)). [emphasis added]

Hon. Raymond J. Dearie
August 22, 2014
Page 3

Here, as set forth in the Objections (pp. 4-6), Andrews' sentence on his youthful offender adjudication was, at the time, below the legal minimum prison for an adult offender convicted of the same offense. As demonstrated in the Objections, because that was not an adult sentence, and it was more than five years old at the time the instant offense was committed, it did not "count" under the Guidelines, and, therefore, cannot be the predicate for career offender status here. Indeed, research has disclosed no case upholding and counting as an "adult conviction" a youthful offender adjudication more than five years old that resulted in a sentence below the legal minimum for an adult offender.

**2007 felony assault conviction**

In respect of Andrews' 2007 conviction, the Addendum is oblivious to the binding authority requiring application of the categorical or, where necessary, modified categorical approach to analyze whether the elements of a putative predicate conviction constitute a "crime of violence". *United States v. Reyes*, 691 F.3d 453 (2d Cir. 2012); see *Descamps v. United States,* ___ U.S. ___, 133 S.Ct. 2276, 2287 (2013). Instead, the Addendum invites the Court to find Andrews' 2007 conviction to be a career offender predicate based upon its view of the underlying facts. That is an invitation to commit error.

**The Addendum continues to miscalculate the career offender range.**

The Addendum, like the PSR, persists in miscalculating the advisory sentencing range that would apply *if* Andrews were a career offender. The error originates in a mistake in computing the total offense level if the career offender Guidelines applied to Andrews' Hobbs Act robbery and robbery conspiracy convictions. The Addendum (p.3, bottom), without explaining how it arrived at the figure, says that level is 35. That is five levels too high – the correct figure would be 30.

As the PSR acknowledges, the maximum sentence on the robbery counts is 20 years. PSR ¶ 87. Accordingly, their base offense level under the career offender Guidelines would be 32. Deducting two levels for acceptance of responsibility, the total offense level would be 30. Guideline 4B1.1(b)(3). The Addendum's figure of 35 is simply incorrect. So is the Addendum's range calculation based upon it.

Hon. Raymond J. Dearie
August 22, 2014
Page 4

When the two alternative calculations required by Guideline 4B1.1(c)(2) are made, using the correct level of 30, the greater of the two resulting ranges is 292 – 365 months.  That is the range that would apply if, *arguendo,* Andrews were a career offender.  Objections, p. 18.

**Contrary to the Addendum, Andrews did not restrain the victim Tolmasov**

The Addendum (p. 1, fn. 1) asserts that, when interviewed by the New York City Police, the victim Izkiya Tolmasov advised that it was the shorter of the two robbers who grabbed him by the shirt and tried pulling him to the back to show them the front door.  Andrews is significantly shorter than Peters.

In support of that assertion, the Addendum cites case agents' and police reports which have not been disclosed to the defense.   Mr. Tolmasov has, however, been interviewed by Nelson Lassalle, a licensed private investigator retained by Andrews' counsel under the Criminal Justice Act.  The interview was recorded.  Mr. Tolmasov speaks English imperfectly, with a Slavic accent; nevertheless, he made absolutely clear that it was Peters, the taller of the two robbers, who restrained him, not Andrews.  The following transcript fairly captures the substance of a portion of the interview of Mr. Tolmasov:

| | |
|---|---|
| Interviewer: | Who did you notice came in? |
| Izkiya Tolmasov: | Two guys there one tall, one short guy |
| Interviewer: | Okay, the tall guy - who said something first?  Who did anything? |
| Izkiya Tolmasov: | The tall guy. |
| Interviewer: | The tall guy?  Okay, do you know their names by any chance? |
| Izkiya Tolmasov: | uhh [unintelligible] |
| Interviewer: | There's a Ted Peters. |
| Izkiya Tolmasov: | Peters, Peters, Peters. |
| Interviewer: | Okay, and there's a Philson Andrews. |

Hon. Raymond J. Dearie
August 22, 2014
Page 5

| | |
|---|---|
| Izkiya Tolmasov: | Yeah, the short guy.  Yeah, the short guy. |
| Interviewer: | The short guy's Andrews, and the tall guy is Peters? |
| Izkiya Tolmasov: | Peters _____ |
| Interviewer: | Okay.  So what happened?  Who said what to you? |
| Izkiya Tolmasov: | The Peter - the tall guy  this guy was up here and uh |
| Interviewer: | He went behind the counter? |
| Izkiya Tolmasov: | Yeah, and he was with the mask - with the hood and the mask and the gloves, and with a gun.  And he told me don't look at me; give me all money you have. |
| Interviewer: | Did he point the gun at you? |
| Izkiya Tolmasov: | Yeah.  Give me all money you have.  I gave him money from this cash register and ,I don't know how much was it.   [unintelligible] give him more.  Gave him more.  I told him I gave you all money I have.  It was 12:00 something in the midday - daytime.  It's not even evening.  I don't have another money . I no have.  No, you have.  I know you have.  Show me where they put the money. But we have, you know,... this bag is for change, you know, the singles.  It was exactly like this - the $160.00. |
| Interviewer: | Where was it? |
| Izkiya Tolmasov: | Here. Here And he told me - when he asked me give me more money, I have change also - for change - the thing which I needed for the job.  He took the money with this bag.  And this guy, the short guy, this one, he was here.  Please, don't stay there.  He was here and looking around.  It was , and the police came.  I don't understand who called the police because they was like four or five minutes here, and there was five - maybe ten, maybe five cars and the police outside |
| Interviewer: | They were only here for four or five minutes before the police showed up? |
| Izkiya Tolmasov: | Yeah, and this guy, the short guy screamed I see the police.  I see the police car.  The tall guy, he took me by my shirt and show me the back |

Hon. Raymond J. Dearie
August 22, 2014
Page 6

                  door. Show me - open the back door. I'm sorry; I don't have a back door here, which we don't have it. It's only one of a door.

| | |
|---|---|
| Interviewer: ] | One entrance and exit |
| Izkiya Tolmasov: | Yeah, and I told him I don't have another door. No, he took me like this, come, come show me back door, show me back door. I don't have a back door. I don't have - it's a wall, i don't |
| | and at this time they [unintelligible] and I ran out |

Further, the hostage, Robert Kane (who happens to be an attorney) was separately interviewed by private investigator Lassalle. Mr. Kane confirmed that it was Peters, not Andrews, who grabbed Mr. Tolmasov and dragged him. Mr. Kane also said that Andrews "never touched me. It was only Ted [Peters] that did all the touching", and that Peters

> was the one that abused me. He was the one that I really thought I was going to be killed. Philson – as I talked to him, as I was telling the ADA, I called him – Ted is taller. The big one and the little one. So that's how I referred to them and in my mind I'm thinking the little one is the nicer one.

**Contrary to the Addendum, Andrews did not take the victim Kane hostage, was not initially aware that he had been taken hostage, and did not seek to further or exploit Kane's being Peters' hostage; hostage-taking was not <u>within the scope of the conduct that Andrews jointly undertook with Peters.</u>**

The Addendum (p. 2) mistakenly asserts that "the defendant and Peters took Robert Kane, the only witness left, hostage." In fact, it was Peters alone, and not Andrews, who took Mr. Kane hostage. When Peters did so, Andrews was in the liquor store basement, looking for a way out. He only learned of the hostage-taking after Peters threw Mr. Kane down a conveyor belt into the basement, followed him, and continued to hold him there.

Mr. Kane told the investigator Lassalle, as follows:

Nelson Lassalle:       How long a time passed between when you entered and this incident?

Hon. Raymond J. Dearie
August 22, 2014
Page 7

Robert Kane:        Five minutes.

Nelson Lassalle:    Five minutes?  The cops were there that fast?

Robert Kane:        Yes, that fast, yes, within seconds, really.  I mean, yeah, five minutes, and he puts the gun in front of my, and then he turned me around and he said, "You're my insurance policy."  He has me like this and he puts the gun in front of my face and he shot the back wall.  And he said, and he said "Just so you know it's loaded."

Nelson Lassalle:    Peters said that?

Robert Kane:        Yeah.

Nelson Lassalle:    And what is Philson doing?

Robert Kane:        He's still in the basement banging around.

Peters then threw Mr. Kane downstairs, bounced him around, and exclaimed that he had him by the arm.  From what Mr. Kane said happened next, it is evident that Andrews, in the pitch darkness, did not know what Peters was talking about.  It was too dark for Andrews to see that Peters was had Kane hostage with him or that was holding Kane by the arm.  Instead, Andrews assumed that Peters mistakenly thought that he had gotten hold of his own (Andrews') arm.  Thus, the interview continued:

Nelson Lassalle:    He's [Andrews] still in the basement looking for an exit?

Robert Kane:        Right, and the reason I know that is because he drags me to the top of the stairs and he started screaming again, but he wouldn't let me go like he let the other guy go.  And he threw me down the conveyor belt.  So I went falling to the bottom.  He raced down, grabbed me, picked me up, and he's pretty much kick [?] slapping.  Not even, couldn't see your hand in front of your face, it's that dark down there.  And he just used me as like a batting range, bouncing me against all the boxes, screaming, "You've got an exit?  You've got an exit?"  And they're both screaming at each other.  Next thing I know, he threw the boxes.  Ted, who kept my arm, he goes, "I got you."  And Philson goes, "What do you mean?"  He goes, "I got your arm." -- "It's not my arm.  It's not my arm."  He goes, there's no exit.  They drag me back up the stairs –

Hon. Raymond J. Dearie
August 22, 2014
Page 8

| | |
|---|---|
| Nelson Lassalle: | He can't see Philson?  He's looking for him too within the basement? |
| Robert Kane: | He literally through a wall of boxes he was tapping to reach his arm.  Umm - he – they – he dragged me back to the stairs, dragged me up the stairs.  Remember that's the back wall, and Ted goes running around the back pushing boxes over, pretty much puts me right in the doorway, has me by the collar in the head and always has the gun in my mouth, or on my head, or my spine. |
| Nelson Lassalle: | You mean Peters? |
| Robert Kane: | Peters.  I mean, yeah. |
| Nelson Lassalle: | Right, Ted Peters and – |
| Robert Kane: | Ted, Ted Peters, yeah.  He's the only one – he's the only one that constantly had me. |

Andrews apologized to Mr. Kane for Peters' taking him hostage.  Mr. Kane related that Andrews "kept coming over to me saying, 'I'm sorry, there's nothing I can do.  You see what I'm dealing with [referring to Peters, who was saying he would go out in a blaze of gunfire].  He kept saying to me 'I'm sorry, I'm sorry.'"  Mr. Kane told Investigator Lassalle that he then addressed Andrews "sa[ying] 'Listen, I was raised Catholic.  Do you mind, I want to pray.  Do you want to pray with me?' And he [Andrews] got on his knees in front of me".[1]

Andrews, unlike Peters, was not involved in the decision to take Mr. Kane hostage, did not help keep him hostage, did not seek to exploit his status as hostage, apologized to Mr. Kane then and there for Peters' having taken him hostage, and, risking his own life with the irrational Peters, repeatedly tried to get Peters to relinquish the gun, release Mr. Kane, and surrender.

Eventually, Andrews managed to ply Peters with enough wine and liquor from the liquor store's stock that he became so drowsy that Andrews could safely let Mr.

---

[1] Due to an oversight of counsel, the Objections mistakenly state that it was Andrews who first suggested that he and Kane pray together.

Hon. Raymond J. Dearie
August 22, 2014
Page 9

Kane escape, and, then, safely surrender himself. Peters, now tranquilized with alcohol and deprived of his hostage, eventually left his gun behind in the store and surrendered himself.

As serious as this crime was, Andrews did not intend or deliberately further the worst part of it. He did his level-headed best to defuse a highly fraught and dangerous stand-off that came about as a result of Peters' hostage-taking that Andrews had not intended or foreseen. Andrews' actions, coupled with the restraint and skill of the police, may well have saved lives. The Court should consider that in sentencing Andrews.

Respectfully submitted,

    /S/

Norman Trabulus

attachments

cc.: USPO Angelica Deniz (by email of pdf. file, and pdfs of attachments)

1/

Brooklyn NY
11234
8-15-2014

To Judge Dearie

Dear Judge Dearie, How are you, Judge I am writing this letter to you Judge It's ms Hilda Jackson, I am Philson Andrews Mom, Philson is the 3rd of my 3 son's, Judge I am Diagnosis with Breast Cancer, and am on Tamoxifen 20 mg tablet, when I had my first surgery Philson was there for me, He help me in Every way he always use to keep me from Stress, saying Mom I want you to be strong while there is life there is hope God Loves u Mom, so be strong, I love you Mom keep faith, But Judge, my Life is dull, because he is not around me, I always Remembering his smile and how he was so good to me, He also was helping my Mom when she was sick, he use to feed my mom when she wanted food, Philson use to help holding her hands for her to walk, He is a Loving son, Philson also help me changing my bandage at Home, Judge Dearie, Philson is Love by Every Realitives and friends, his Brothers, family and Parent, Cousins, Philson is a quiet Light with a Loving smile, he is a Son that if he have the Last dollar and you hungry he will give it to the hungry, he believing in God

2/

Philson he always use to Read his Bible and Prayer, we all miss him a lot, Philson, I wish Him Comfort, and the feeling that Comes from Knowing that not Even, the deepest Sadness can last forever, the power that Comes from believing in the possibility that happiness lies ahead of Him, Philson, I wish him peace — the Calm that Comes from trusting in Something beyond yourself, the ease that Comes from Surrendering worry and anxiety to a greater power, these things I wish for Philson, the Support of Knowing there's always God is there for Philson, I Love Philson, he is a Loving and Decent Son, he is a good person, He only made a mistake, I've though of Philson, I Know Philson he is not a bad person, I know from my heart and he know he made a mistake, God Blessings,

From
Hilda Jackson

Dear Judge Raymond J. Dearie

I am writing this letter on the be half of Philson Andrews. My boyfriend of five years. Philson has to be the sweetest caring person I know. One thing I can say about Philson is that ever since I met him, he's been the best support system to me towards my college degree and anything else. Even with him being gone he still worries about my school, keeping track of my college credits. Philson was always there when I needed him the most, I miss him dearly. He has the biggest heart to his love ones. His family misses him. Philson loves his family deeply. I am asking for your leniency in sentencing Philson and plea that your sentence be merciful. Once he comes home we can start our family. I will be complete.

I beg your Honor to please consider my letter, when you hand down your sentence. Only you have the ability to give Philson a second opportunity.

Thank you for your time and consideration,

Paula Johnson

*Paula Johnson*
8-18-2014