**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

EAG:AES
F#2011R0123

*271 Cadman Plaza East, 6th Floor*
*Brooklyn, New York 11201*

September 12, 2014

**VIA ECF AND HAND DELIVERY**

The Honorable Raymond J. Dearie
United States District Court
Eastern District of New York
225Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Philson Andrews
Docket Number 11 CR 587 (RJD)

Dear Judge Dearie:

The Government respectfully submits this letter in response to defendant's sentencing memorandum, dated August 22, 2014, and in advance of sentencing in the above-captioned case, which is scheduled for November 20, 2014. For the reasons set forth below, the Government respectfully requests that the Court impose a sentence within the applicable Guidelines range of 171-183 months' imprisonment. Furthermore, as the defendant pled guilty to a violation of 18 U.S.C. 924(c)(1)(A)(iii) in Count Three, the defendant is subject to a mandatory minimum sentence of 120 months' imprisonment on that count, which must run consecutively to any sentence imposed in connection with Counts One and Two.

I. Background

A. The Offense Conduct

On June 29, 2011, the defendant and his co-conspirator Ted Peters ("Peters") – both of whom are members of the Outlaws gang, which operates in the Flatbush neighborhood of Brooklyn – along with two other men, set out to rob a drug dealer who lived in Brooklyn. Pre-Sentence Investigation Report ("PSR") ¶ 19. The men drove to a home in East New York, Brooklyn, where the defendant went inside and came out with a handgun. Id. The men then drove to another house, which they intended to rob; however, the robbery

never took place. Id. Instead, the men took off and drove through Brooklyn. Id. As they drove down Avenue N, the defendant advised that there was a liquor store that they could rob. Id.

The men pulled up near the liquor store, and the defendant and Peters put on masks; Peters also took the handgun from the defendant. Id. The defendant and Peters then entered the Arrow Wine and Liquor Store at 4804 Avenue N. Id. ¶ 10. Peters brandished the handgun and demanded that the store's employee ("IT") open the register. PSR ¶ 11. The defendant stood guard at the door, blocking two customers ("WB" and "RK") from leaving the store, and yelling at both to get on the ground. Id. Once the register was opened, Peters took the money, and then dragged IT towards the store's safe in the back of the store.[1] Id.

Unbeknownst to the defendant and Peters, a passerby saw Peters pull out his gun outside the store, and alerted nearby New York City Police Department ("NYPD") officers. Id. Several NYPD officers immediately went to the store and saw a number of people inside the store, along with the defendant and Peters, who were wearing surgical masks. Id. Through the store door, the NYPD officers ordered the defendant and Peters to allow the other individuals to leave. Id.

Peters and the defendant demanded that IT show them the back exit; however, IT advised them that there was no back exit. Id. IT subsequently broke away from Peters and sprinted out the door; WB was also able to escape. Id. However, Peters grabbed RK, and he and the defendant held RK at gunpoint. Id. ¶ 12. NYPD officers then heard a gunshot, and Peters brought RK to the rear of the store, followed by the defendant. Id.

A several-hours-long standoff ensued, during which Peters, the defendant and RK remained at the rear of the store, while Peters and the defendant communicated with law enforcement officers who tried to convince them to let RK leave. Id. ¶ 13. RK was able to escape when Peters was distracted; the defendant surrendered shortly thereafter, and Peters surrendered approximately a half-hour later. Id. Ultimately, the defendant and Peters permitted the hostage to leave, and both the defendant and Peters surrendered to the police. Id. NYPD officers who entered the store immediately after the robbery observed cash and a Glock pistol on the floor, as well as two discharged shell casings. Id. The pistol was later determined to be operable. Id.

---

[1] The PSR indicates that the defendant grabbed IT after the police arrived. However, based on the government's interviews with the witnesses, it is the government's understanding that Peters dragged IT to the back of the store to find the safe, and then continued to hold on to IT once Peters and the defendant demanded to know where the exit was located. The defendant does not appear to have grabbed IT. As a result, the government joins the defendant's objection to PSR paragraph 11 on this point.

B. Procedural History

On August 17, 2011, a grand jury returned an indictment in the above-captioned matter which charged the defendant and Peters with Hobbs Act robbery for the June 29, 2011 robbery, as well as unlawful use of a firearm in connection with that robbery. The indictment also charged Peters and another Outlaws gang member, Darsky Sylvestre ("Sylvestre"), with Hobbs Act robbery and unlawful use of a firearm in connection with two robberies that took place on April 23, 2011, in Brooklyn, New York.[2] On December 16, 2011, Sylvestre pled guilty to both substantive robbery counts with which he was charged, as well as the unlawful use of a firearm in connection with one of the two robberies. On May 3, 2012, Peters pled guilty to all three substantive robbery counts with which he was charged, as well as to the use of a firearm in furtherance of one of the two April 23, 2011 robberies, and in furtherance of the June 29, 2011 robbery.

A superseding indictment was returned by a grand jury on March 7, 2013. It charged the defendant with the following crimes in connection with his role in the June 29, 2011 robbery of the Arrow Wine and Liquor store: conspiracy to commit Hobbs Act robbery (Count One), Hobbs Act robbery (Count Two), and unlawful possession and discharge of a firearm in furtherance of a crime of violence (Count Three).

A trial date was set for September 9, 2013. On September 4, 2013, five days before trial, the defendant pled guilty to the indictment before Magistrate Judge Cheryl L. Pollak. Id. ¶ 1.

C. The Defendant's Criminal History

The defendant's criminal history includes two prior convictions, one for a stabbing and one for injuring a witness to a robbery; he also participated in two additional robberies with Peters and Sylvestre on April 23, 2011.

1. 2004 Conviction for Assault

The defendant was arrested on May 27, 2003, after he stabbed a victim twice during an argument. PSR ¶ 54. The defendant was adjudicated as a youthful offender in Criminal Court in Brooklyn, New York, pled to one count of assault in the second degree with intent to cause physical injury, and was sentenced to a term of one to three years' imprisonment. Id.; PSR Addendum at 2. The defendant served slightly less than three years in an adult prison facility, and was released to parole in May 2006. PSR ¶ 54. The defendant violated his parole for failing to report a subsequent arrest for robbery in February 2007; he also violated his parole by failing to comply with his curfew hours. Id.

[2] See infra section I.C.3. for a discussion of the April 23, 2011 robberies.

2. 2008 Conviction for Assault

In January and February of 2007, the defendant and others committed a series of robberies. PSR ¶ 55. On January 25, 2007, the defendant and a co-conspirator robbed the Dora Grocery in Brooklyn, New York. Id. The defendant and his co-conspirator entered the store, and the co-conspirator brandished a pistol. Id. When the victim had difficulty opening the cash register, the co-conspirator proceeded to beat the store employee in the head and chest with that pistol, and then the defendant and his co-conspirator made off with approximately $8,000 from the cash register. Id. The defendant and his co-conspirator also committed two other robberies in similar fashion, one on January 25, 2007 and one on January 30, 2007; in each case, the victim was beaten and the defendant and his co-conspirator recovered a sum of money. Id. On February 1, 2007, the defendant committed a fourth robbery with others, taking the victims' money at gunpoint. Id.

The defendant was arrested for the four robberies on February 1, 2007. Id. Ultimately, the defendant pled to a single count of assault in the second degree for causing injury to a non-participant in the course of a felony, and was sentenced on November 10, 2008, to 30 months' custody. Id.

After the defendant was released, he violated the conditions of his parole on a number of occasions. Id. In July 2009, he broke curfew to attend a baby shower, where he was shot in the leg; he failed to report the incident to his parole officer. Id. In October 2009, the defendant was arrested for possession of marijuana; he again failed to report the arrest to his parole officer. Id. Finally, the defendant was arrested on June 29, 2011, for the instant offenses; he also failed to report the incident to his parole officer. Id.

3. April 23, 2011 Robberies

On April 23, 2011, Sylvestre, Peters and the defendant drove to Brothers Deli in Brooklyn, New York. PSR ¶ 7. While the defendant remained in the car, Peters and Sylvestre entered the store. Id. Peters pointed a revolver at the employee behind the counter, while Sylvestre retained control over the store's customers. Id. ¶¶ 7. 14. The two men stole approximately $1450 from the cash register, lottery machine, and one of the customers. Id. They returned to the car, and the defendant drove all three from the scene. Id. The men then decided to commit a second robbery, and the defendant drove them to Moshen Abdullah Grocery, also in Brooklyn, New York. Id. ¶¶ 7, 15. Once again, the defendant remained in the car; Peters and Sylvestre entered the store; Peters brandished a revolver at the employee; and the two men made off with money from the cash register and an additional $700 from a store customer. Id.

Peters and Sylvestre left the store and returned to the car, after which the

defendant drove them to the Canarsie area of Brooklyn. Id. ¶ 15. Sylvestre and Peters got out of the car, and were immediately spotted by police officers, who were looking for individuals matching their descriptions. Id. ¶ 7. The two men fled in different directions; Peters was seen tossing his revolver on the ground. Id. Peters and Sylvestre were ultimately apprehended, while the defendant left the scene in his vehicle. Id.

In post-arrest statements, both Peters and Sylvestre identified the defendant as the driver of the vehicle for the April 23, 2011 robberies. Id. ¶¶ 14-18. Peters stated that it was the defendant's idea to commit the robberies; Sylvestre stated that Peters and the defendant called him together to help out with the robberies. Id.

## II. The Defendant Has An Applicable Guidelines Range of 171-183 Months' Imprisonment, and Is Subject To A Ten-Year Mandatory Minimum Sentence

For the reasons set forth below, the government believes that the applicable Guidelines range is 171-183 months' imprisonment. In addition, because the defendant pled guilty to a violation of 18 U.S.C. § 924(c)(1)(A)(iii), he is subject to a mandatory minimum sentence of 120 months on Count Three, which must run consecutively to any sentence of imprisonment imposed on Counts One and Two. The government has addressed the defendant's various objections to the PSR below; significantly, the government agrees with the defendant that the defendant's 2008 conviction cannot be classified as a "crime of violence" pursuant to U.S.S.G. § 4B1.2, and that as a result the defendant does not qualify as career offender.

### A. Pre-Sentence Investigation Report and EDNY Probation's Guidelines Calculation

The Probation Department ("Probation") issued a Pre-Sentence Investigation Report ("PSR") in the above-captioned matter on January 16, 2014, and an Addendum to the PSR on February 10, 2014 ("PSR Addendum"). In the PSR Addendum, Probation disagreed with all of the defendant's proposed revisions to its Guidelines calculations.

Probation concluded that the defendant is a career offender as defined by U.S.S.G. 4B1.1, because it determined that both the defendant's 2004 and 2008 convictions qualify as "crimes of violence." PSR ¶ 50, PSR Addendum at 2-3. Consequently, Probation determined that the defendant's base offense level is 37. Id. As the defendant did not plead guilty in a timely fashion, he only received two points for acceptance of responsibility; as a result, the defendant's total offense level was calculated as 35. PSR ¶ 51. Probation further concluded that the defendant's total criminal history category score is 8 (three points for each of the 2004 and 2008 convictions, and two points for committing the instant offense while on parole), resulting in a Criminal History Category IV. Id. ¶ 57. However, because Probation determined that the defendant is a career offender, Probation determined that the defendant

fell within Criminal History Category VI. Id. ¶ 52.

A defendant with a Criminal History Category VI and a total offense level of 35 has a Guidelines range of 292-365 months' imprisonment. PSR ¶ 88. However, as the defendant was convicted of 18 U.S.C. § 924(c) and is a career offender, Probation calculated the defendant's applicable Guidelines range as 412-485 months, pursuant to U.S.S.G. § 4B1.1(c)(2)(A). The defendant is also subject to a statutory mandatory minimum sentence of 10 years. Id.; 18 U.S.C. § 924(c)(1)(A)(iii).

B. The Defendant's Objections to the PSR and the Government's Responses

The defendant filed a sentencing memo on August 22, 2014 ("Def. Mem."), which reiterated prior objections to the PSR ("Def. PSR Obj."). See Docket Entry Nos. 139, 146. The defendant's objections and the government's responses are set forth below.

1. The Defendant Is Not A Career Offender

The defendant contends that he is not a career offender pursuant to U.S.S.G. § 4B1.1, because neither his 2004 nor his 2008 conviction constitutes a qualifying offense. Def. Mem. at 2-4. Specifically, he argues that (1) his 2004 conviction, which was resolved as a youthful offender adjudication, is not an "adult conviction" for purposes of the career offender guideline, and (2) his 2008 conviction was not for a "crime of violence."

In its addendum, Probation set forth the reasons why the defendant's 2004 conviction is a qualifying offense for the career offender guideline, and the government agrees with that analysis. See PSR Addendum at 3; see also infra discussion of U.S.S.G. § 4A1.2 at Section II.B.4. However, the government agrees with the defendant that his 2008 conviction is not a "crime of violence" as defined in U.S.S.G. § 4B1.2, and thus is not a qualifying offense for the career offender guideline. As a result, the government agrees with the defendant that the defendant is not a career offender, and that the PSR should be amended accordingly.

The analysis for determining whether a conviction under a given statute constitutes a "crime of violence" is elements-based. See Descamps v. United States, 133 S. Ct. 2276, 2287 (2013).[3] That is, the question of whether the conviction is a "crime of

[3] The definition of "crime of violence" pursuant to the career offender guideline is identical to the definition of "violent felony" contained in the armed career criminal act ("ACCA"). United States v. Reyes, 691 F.3d 453, 458 fn. 1 (2d Cir. 2012). Consequently, "cases interpreting the ACCA's definition of 'violent felony' are highly persuasive in interpreting the Guidelines' definition of 'crime of violence.'" Id. In Descamps, the Supreme Court

violence" turns on the elements required for conviction, not on the underlying facts of the case. Id. Unless an element of the crime of conviction "has as an element the use, attempted use, or threatened use of physical force against the person of another," then the conviction cannot be classified as a "crime of violence." Id.

Descamps recognized that in a narrow range of cases where the statute is "divisible" – that is, where it contains multiple, alternate versions of the crime, one of which constitutes a "crime of violence" and one of which does not – then a "modified categorical approach" is appropriate. Id. at 2283-84. Under such an approach, the government must show that a defendant's conviction "necessarily" rests on facts identifying the conviction as a crime of violence; furthermore, the inquiry is limited "to examining the statutory definition, charging document, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented." United States v. Reyes, 691 F.3d 453, 458 (2d Cir. 2012).

Here, while the defendant was arrested in connection with four robberies in 2007, his 2008 conviction was for a single violation of New York Penal Law ("NYPL") § 120.05(6), assault in the second degree, in connection with one of the robberies. That statute reads as follows:

> In the course of and in furtherance of the commission or attempted commission of a felony ... or of immediate flight therefrom, he, or another participant if there be any, causes physical injury to a person other than one of the participants.

A conviction under this statute does not have as an element of the offense the use, attempted use, or threatened use of physical force against another person. A defendant could violate this statute without the use of any physical force at all; the statute requires only that a defendant "cause" physical injury to a person other than a participant, but such injury could result from an unintentional or accidental action by the defendant, or even from the victim's own fear or fright. See Donovan v. Levine, 2003 WL 21845744 at *6 (E.D.N.Y. 2003) (detailing jury instruction for statute).[4]

---

limited application of the modified categorical approach under ACCA to "divisible" offenses; the same limitation on the use of the modified categorical approach has therefore been found to apply to "crimes of violence" under the career offender guideline. Id.

[4] As the defendant noted in his submission, United States v. Giudice, 2004 WL 1152539, at *3 (S.D.N.Y. 2004) (DLC), appears to be the only case that addresses the question of whether NYPL § 120.05(6) constitutes a "crime of violence." There, the court noted that both the government and the defense had agreed that a violation of NYPL § 120.05(6) would not constitute a crime of violence; however, the parties later discovered that the defendant had violated a different subsection of NYPL § 120.05, so the issue was not ultimately

It also doesn't appear that this statute should be considered "divisible"; it is simply a broad statute that encompasses both conduct that involves the intentional use of force and conduct that does not under the same general elements. Moreover, even if the statute could be considered "divisible," and the modified categorical approach were to apply, the defendant's conviction would still not be considered a "crime of violence." Here, as the defendant detailed in his February 4, 2014 filing, both the charging language in the indictment and the defendant's plea colloquy mirror the language of the statute and include no additional facts about the underlying crime; nor did the defendant otherwise "assent" to any factual findings that could be used to show that the underlying crime was a "crime of violence." See Defendant's PSR Objections, Docket No. 139 at 10-11. Consequently, even if it was appropriate to analyze the conviction under the modified categorical approach, the defendant's 2008 conviction would not be considered a "crime of violence."

For these reasons, the defendant is not a career offender, and the government submits that the PSR should be amended accordingly.

2. The Defendant Did Not Restrain IT

As detailed supra in Section I.A., based its own interviews with IT, the government does not believe that the defendant restrained IT during the course of the robbery. Consequently, the government agrees that the PSR ¶ 11 should be amended to reflect that the defendant did not restrain IT.

3. The Enhancement For Restraining A Victim Is Applicable

The defendant objects to a two-level enhancement pursuant to U.S.S.G. § 2B3.1(b)(4)(B), arguing that he did not take RK hostage; that he did not seek to "further" the hostage-taking; and that hostage-taking was not "within the scope of the conduct" undertaken by the defendant. Def. Mem. at 6-7. In support of his position, the defendant has offered a portion of a transcript of a recording of RK, which was made by a private investigator without RK's knowledge; the underlying recording has not been provided to Probation or to the government, so that its accuracy may be assessed. Id.[5] The defendant uses this transcript to argue that it was Peters who made the decision to take RK hostage; that it was Peters who physically restrained RK; that the defendant apologized to RK for taking him hostage; and that the defendant ultimately helped RK escape several hours later. Id.

---

reached by the court.

[5] The government and Probation were also not provided with the recording made by the private investigator of his conversation with IT, which was also made without IT's knowledge.

Even accepting the defendant's self-serving version of the facts as accurate, the enhancement should nonetheless apply in this case. RK was in fact physically restrained to facilitate the defendant and Peters' escape from the store once the NYPD arrived on the scene; specifically, RK was dragged to the back of the store as both the defendant and Peters sought to escape, and Peters advised RK that he was their "insurance policy." Whether or not the defendant directly participated in the restraint of RK, it was reasonably foreseeable to him at the time that he agreed to commit an armed robbery of a store that taking a hostage with a firearm to facilitate escape might occur.

In fact, even if the defendant had conspired with Peters to commit the robbery but had not been present in the store at the time that the robbery occurred, he would still be held responsible for the restraint of RK. In United States v. Diaz, 523 Fed. Appx. 790, 792 (2d Cir. 2013), the defendant conspired to commit a robbery, but was not actually present when the robbery occurred; in the course of the robbery, several victims were forced into a room at gunpoint and locked in. The Second Circuit upheld an enhancement pursuant to U.S.S.G. § 2B3.1(b)(4)(B) even though the defendant wasn't present for the robbery, concluding that "we cannot agree that physical restraint is not a foreseeable conduct in a robbery." Id. (citing United States v. Molina, 106 F.3d 1118, 1122 (2d Cir. 1997) (finding that it was reasonably foreseeable to a defendant who conspired to commit an armed robbery but was not present during the robbery itself that the weapons used in the armed robbery might be fired)).

For these reasons, the government agrees with EDNY Probation that an enhancement pursuant to U.S.S.G. § 2B3.1(b)(4)(B) is applicable, and no revision to the PSR is required.

4. The Defendant's 2004 Conviction Constitutes An Adult Conviction

The defendant contends that because he was adjudicated as a youthful offender in connection with his 2004 conviction, such conviction is not an "adult offense." Def. PSR Obj. at 4-6. The defendant further argues that as a result, he should not receive three criminal history points for this conviction, because non-adult sentences for crimes committed prior to age 18 are subject to the five-year limit of U.S.S.G. § 4A1.2(d)(2). Id.

The government agrees with Probation that the defendant's 2004 conviction is an "adult offense." PSR Addendum at 2. Section 4A1.2(d)(1) applies to a defendant who "was convicted as an adult and received a sentence of imprisonment exceeding one year and one month." A conviction that New York state has deemed a "youthful offender" conviction may nevertheless be an "adult" conviction for purposes of Section 4A1.2(d), depending on its "substance." United States v. Driskell, 277 F.3d 150, 154 (2d Cir. 2002). "There is no set formula for determining the substantive consequence of the criminal proceeding underlying

the youthful offender adjudication," United States v. Jackson, 504 F.3d 250, 253 (2d Cir. 2007) (internal quotation marks omitted), but courts have tended to "focus on the nature of the proceedings, the sentences received, and the actual time served." Driskell, 277 F.3d at 154. Here, the defendant was convicted in Criminal Court in Brooklyn, New York – an adult court – of assault in the second degree with the intent to cause injury with a weapon; was sentenced to serve one to three years in an adult prison facility; and served just short of three years' imprisonment. Based on these factors, the defendant's 2008 conviction should be considered an "adult conviction" for purposes of Section 4A1.2(d). See, e.g., Driskell, 277 F.3d at 154 (serving more than a year and a month, and doing so in an adult facility, indicate that courts can consider the adjudication to have been an adult conviction); United States v. Mitchell, 326 Fed.Appx. 1 (2d Cir. 2009) (finding that a youthful offender adjudication where the defendant served more than one year and one month in an adult facility qualified as an "adult conviction").

The defendant also argues, without any legal support, that because his sentence was of an indeterminate length, and was less than what he would have received had he not been adjudicated as a youthful offender, his conviction cannot be considered an "adult" conviction. This is incorrect. Whether a defendant's sentence is shorter because he was adjudicated as a youthful offender than it would have been had he not been adjudicated as a youthful offender is irrelevant to the analysis – the question is only whether the conviction is for an "adult offense" and if the defendant was sentenced to more than a year and a month. In fact, if the defendant was correct, then a youthful offender adjudication in New York could almost never be considered an adult offense, because the youthful offender sentencing scheme almost always provides for shorter sentences than the defendant would have received in for the corresponding adult offense. See New York Penal Law § 60.02 (providing that "the court must impose a sentence" on a youthful offender who has committed a felony that is "authorized to be imposed upon a person convicted of a class E felony"). This is obviously not the case, as youthful offender adjudications for felonies are routinely upheld as "adult offenses." For example, in United States v. Amante, 256 Fed. Appx. 434 (2d Cir. 2007), the Second Circuit concluded that the district court had not erred when it found a defendant's youthful offender convictions for two drug felonies to be "adult offenses" when the defendant was sentenced to a term of one to three years' imprisonment for each such offense.

For these reasons, the defendant should receive 3 criminal history points for his 2004 conviction, and no revision to the PSR is required.

C. The Government's Guidelines Calculation

As the defendant is not a career offender, his base offense level for Counts One and Two should be 20 pursuant to U.S.S.G. § 2B3.1, which is the applicable guideline for robbery. For the reasons set forth above, a two-level enhancement applies pursuant to

U.S.S.G. § 2B3.1(4)(B), bringing the defendant's offense level to 22. The defendant should also receive a two-level reduction for acceptance of responsibility, resulting in a final adjusted offense level of 20.

As set forth in the PSR, the defendant has eight criminal history points – three for each of the 2004 and 2008 convictions, and an additional two points for committing the instant offense while on parole. PSR ¶ 57. This places the defendant in Criminal History Category IV. His Guidelines range for Counts One and Two is therefore 51-63 months.

However, because the defendant was convicted of 18 U.S.C. § 924(c)(1)(A)(iii), he is also subject to a 120 month mandatory minimum sentence on Count Three, which must run consecutively to the sentence imposed for Counts One and Two. Consequently, the defendant's final Guidelines range is 171-183 months.

III. A Guidelines Sentence Is Appropriate

The government respectfully requests that the Court impose a sentence within the Guidelines range. That range reflects the seriousness of the defendant's conduct in committing an armed robbery of a store, during which a victim was taken hostage for several hours and the defendant's co-conspirator twice fired his gun. See 18 U.S.C. § 3553(a)(1), (a)(2)(A). The defendant's actions in planning and carrying out the robbery were highly calculated: he selected a desirable target, made sure he and Peters had a car parked nearby for an easy getaway, armed Peters with a gun he had procured earlier that day, wore a mask to conceal his identity, and took up his position at the store door in order to prevent any potential witnesses from fleeing the scene during the robbery.

The robbery itself was brazen and without regard for human life: the defendant and Peters charged into the liquor store, brandishing a loaded gun, at lunchtime during the workweek in a busy commercial area in East Flatbush, when there were a number of people in the store and many more people on the sidewalk. (In fact, the reason the NYPD was able to respond to the robbery so quickly was because Peters took out the gun on the sidewalk outside the store, where he was spotted by a passerby.) Peters fired the firearm twice during the moments after the NYPD's arrival; either of those shots could have killed RK or one of the many bystanders and law enforcement officers on the scene. After the situation went south, the defendant did not immediately surrender; instead, he and Peters took a hostage at gunpoint and holed up at the back of the store for hours. And all of the defendant's actions, as well as the enormous risks he took with other people's lives, were simply to steal money for himself.

In his sentencing submissions, the defendant argues at length that his actions after he and Peters took RK hostage and were unable to find an escape route "briefly rose to the level of heroism, albeit self-interested heroism, and contributed greatly to the resolution

of a highly charged and dangerous situation without injury to anyone." Def. PSR Obj. at 15. While the Court can and should consider the fact that the defendant asked Peters to release RK and ultimately helped RK escape the store, the suggestion that the defendant's actions were "heroic" is not only self-serving, but highly disingenuous. The defendant may well have regretted his decision to rob the store once he and Peters were trapped inside with no means to evade law enforcement, and he may well have wanted to keep a bad situation from getting worse by ensuring that Peters did not kill the defendant, RK or himself. But it is important not to lose sight of the fact that it was the defendant who decided to commit an armed robbery with Peters of a liquor store containing multiple people, and it was this decision that created the situation that he, at some point much later on, decided to help defuse. Moreover, in conversations with law enforcement during the standoff, both Peters and the defendant repeatedly referred to their "priors" and asked about how the fact that they took a hostage would impact the ultimate disposition of the case; in light of these statements, the defendant's decision to let RK go may be seen to be as calculated as his plans to rob the store in the first place.

The defendant's history and characteristics, and the need to protect the public from further crimes of the defendant, also strongly suggest that a Guidelines sentence is appropriate here. 18 U.S.C. § 3553(a)(1) and (a)(2)(B). Over the past ten years, the defendant has engaged in a course of highly violent conduct as a member of the Outlaws gang, including the stabbing that led to his 2004 conviction; the string of four armed robberies that led to his 2008 conviction, during which multiple victims were beaten; the armed robberies in April 2011 where the defendant served as a getaway driver; and the instant offenses. After serving time for his 2004 and 2008 convictions, the defendant made no effort to comply with the terms of his release; he committed the 2008 conviction while on parole for the 2004 conviction, and the April 2011 robberies and the instant offenses while on parole for his 2008 conviction. Even while in jail, the defendant has been unable to control his violent tendencies; during his incarceration in 2006, he was sanctioned for violent conduct and fighting.

While the career offender guideline does not apply here because of the language in the specific statute to which the defendant pled in connection with the 2007 robberies, the policy concerns that animate that guideline – that violent felonies committed by recidivist offenders should be punished more severely than violent felonies committed by first- or second-time offenders – should be given great weight here as part of the Court's 3553(a) analysis. See, e.g., United States v. Sanchez, 517 F.3d 651, 668 (2d Cir. 2008) (observing that "the policy concerns reflected in § 994(h) are relevant to several of the sentencing factors that the court must consider in complying with § 3553(a)."). Time and time again, the defendant has indicated he has no respect for or desire to follow the law; in doing so, he has not only committed serious crimes, but he has repeatedly and callously put members of his own community at risk.

IV.     Conclusion

In sum, for the reasons set forth above, the Government respectfully requests that the Court impose a sentence within the applicable Guidelines range of 171-183 months' imprisonment.

        Respectfully Submitted,

        LORETTA E. LYNCH
        United States Attorney

By:     /s/
        Alixandra E. Smith
        Assistant U.S. Attorney
        (718) 254-6370

cc:     Norman Trabulus, Esq. (via ECF)
       Angelica Deniz, United States Probation Officer (via email)